UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-21006-CIV-ALTMAN

**YILIAN QUINTANA RAMIREZ**,

    *Petitioner*,

v.

**RICKY DIXON, SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS**,

    *Respondent*.

_____/

## ORDER

In this petition for a writ of habeas corpus under 28 U.S.C. § 2254, the Petitioner, Yilian Quintana Ramirez, challenges the constitutionality of his state-court conviction for DUI manslaughter and reckless driving. *See* Petition [ECF No. 1] at 1.[1] After careful review, we **DENY** the Petition.

### THE FACTS

On December 28, 2014, Ramirez "drove his vehicle into the passenger side of Amanda Lazo's vehicle," killing Lazo and severely injuring her passenger, Moises Castro. *See* Direct Appeal Answer Brief [ECF No. 13-1] at 113. The State of Florida charged Ramirez with vehicular homicide (Count 1), reckless driving leading to serious bodily injury (Count 2), and DUI manslaughter (Count 3). *See* Amended Information [ECF No. 13-1] at 59–63. On May 10, 2018, a Florida jury found Ramirez guilty of all three counts. *See* Verdict [ECF No. 13-1] at 65–67. Before sentencing, the state judge vacated Ramirez's conviction on Count 1 because the parties had agreed that it was just a lesser-included offense of Count 3. *See* Order Vacating Count 1 [ECF No. 13-1] at 83; *see also* Sentencing

---

[1] The case is now ripe for adjudication. *See* State's Response [ECF No. 12]; Ramirez's Reply [ECF No. 15].

Hr'g Tr. [ECF No. 14-10] at 11 ("[The Court:] Seems like both sides are in agreement that the verdict in count one is a lesser included offense of count three[.]").

With Count 1 out of the way, the judge sentenced Ramirez to fifteen years in the custody of the Florida Department of Corrections. *See* Sentencing Orders [ECF No. 13-1] at 73–82. Ramirez appealed his conviction to the Third DCA, where he advanced only one argument: that the State had failed to "prove Quintana drove in a reckless manner." Direct Appeal Initial Brief [ECF No. 13-1] at 97. On November 27, 2019, the Third DCA summarily affirmed Ramirez's conviction and sentence in an unwritten opinion. *See Ramirez v. State*, 289 So. 3d 474, 474 (Fla. 3d DCA 2019).

On June 1, 2020,[2] Ramirez filed a motion for postconviction relief under FLA. R. CRIM. P. 3.850. *See* Original Motion for Postconviction Relief [ECF No. 13-1] at 131–57. In that motion, Ramirez argued that his trial counsel had been ineffective because of his "failure to properly advise Petitioner that he could be convicted of [Count 3] based upon the State proving that . . . . [Ramirez] was driving under the influence and speeding" and that, had he been properly informed of the crime's elements, Ramirez would have accepted the State's seven-year plea offer. *Id.* at 132–33. The state postconviction court found Ramirez's motion "legally insufficient," Order Denying Motion for Relief [ECF No. 13-1] at 159, but the Third DCA reversed, concluding that "summary denial of the motion, without permitting amendment, constituted an abuse of discretion," *Ramirez v. State*, 324 So. 3d 1025, 1025 (Fla. 3d DCA 2021).

Consistent with the Third DCA's opinion, Ramirez filed an amended Rule 3.850 motion on September 22, 2021. *See* Motion for Postconviction Relief with Incorporated Memorandum of Law ("Postconviction Motion") [ECF No. 13-2] at 2–37. This new postconviction motion raised five

---

[2] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

grounds for relief: (1) that Ramirez's decision to reject the State's plea offer "was involuntary because his counsel erroneously informed him not to accept the plea offer . . . and [failed] to properly explain the facts, evidence and strength of the State's case," *id.* at 5–6; (2) that "counsel was ineffective for failing to file a motion [to suppress] DNA blood samples" based on "a violation of the chain of custody," *id.* at 12; (3) that "counsel was ineffective for failing to suppress the results of a warrantless blood draw," *id.* at 21; (4) that "trial counsel was ineffective for failing to file a motion to suppress [f]irefighter Francisco De Paz['s] statements," *id.* at 29; and (5) that "the cumulative effect of counsel's deficient performance prejudiced the Defendant," *id.* at 36.

On February 25, 2022, the state postconviction court denied Ramirez's Postconviction Motion. *See* Order Denying Postconviction Motion [ECF No. 13-2] at 41–50. The postconviction court found that counsel's (alleged) errors during the plea-negotiation stage hadn't prejudiced Ramirez because Ramirez consistently "rejected any offer that included even a single day of incarceration." *Id.* at 46. It also found that counsel's decision not to file a motion to suppress was part of a reasonable trial strategy. *See id.* at 50 ("There is a strong presumption that trial counsel's performance was not ineffective and that he rendered adequate assistance."). Ramirez appealed this decision to the Third DCA, *see* Postconviction Initial Brief [ECF No. 13-3] at 76–128, which summarily affirmed the postconviction court on December 14, 2022, *see Ramirez v. State*, 356 So. 3d 238, 238 (Fla. 3d DCA 2022). The Third DCA's mandate issued on January 27, 2023. *See* Postconviction Appeal Docket [ECF No. 13-3] at 74. Ramirez filed this Petition on March 9, 2023. *See* Petition at 15.

## THE LAW

### I. The Antiterrorism and Effective Death Penalty Act ("AEDPA")

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

3

of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so

4

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)). "[E]ven if a petitioner successfully carries his burden under § 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under § 2254(d)(2): Even if the state court made a clearly erroneous factual determination, that doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc) (quoting 28 U.S.C. § 2254(d)(2)). Indeed, habeas relief is not warranted "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." *Ibid.* (cleaned up).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (cleaned up).

5

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* harmless-error standard requires habeas petitioners to prove that they suffered "actual prejudice." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht*'s actual-prejudice requirement. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies." (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 1524 (emphasis in original); *see also Mansfield*, 679 F.3d at 1307 ("[A] habeas petition cannot be successful unless it satisfies both [AEDPA] and *Brecht*.").

## II. AEDPA's Procedural Requirements

"[A] person in custody pursuant to the judgment of a State court" has one year to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). But this limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining that the State may express its intent to "waive the limitations bar").

Beyond meeting this one-year window, though, federal habeas petitioners must also *exhaust* their claims by "*properly* present[ing] [them] to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (emphasis in original). Specifically, federal habeas petitioners must "fairly present every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fail[ed] to 'properly' present his claim to the state court—by exhausting his claim[ ] and complying with the applicable state procedure—prior to bringing his federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Ibid.* In other words, where a petitioner has not "*properly* presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan*, 526 U.S. at 848.

There are, to be sure, two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *Dretke v. Haley*, 541 U.S. 386, 393 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense."). A habeas petitioner can establish "cause and prejudice" if (1) "some objective factor external to the defense impeded the effort to raise the claim properly in the state court," and (2) "there is at least a reasonable probability that the result of the proceeding would

7

have been different." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 688 (11th Cir. 2017). "Actual innocence," on the other hand, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The petitioner bears the burden of establishing that one of these exceptions to the procedural-default rule applies. *See Gordon v. Nagle*, 2 F.3d 385, 388 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice."); *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) ("The petitioner must support the actual innocence claim with new reliable evidence[.]" (cleaned up)).

All that said, "[s]tates can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (cleaned up)). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

### III. Ineffective Assistance of Counsel

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). This same standard applies to alleged errors made by both trial counsel and appellate counsel. *See Farina v. Sec'y, Fla. Dep't*

8

*of Corr.*, 536 F. App'x 966, 979 (11th Cir. 2013) ("A claim of ineffective assistance of appellate counsel is evaluated under the same standard as for trial counsel.").

To establish the first prong (deficiency), "a petitioner must [show] that *no* competent counsel would have taken the action that his counsel did take[.]" *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added). So, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel could not have performed deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong (prejudice), "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To succeed on this prong, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

## ANALYSIS

In his Petition, Ramirez advances three grounds for relief. In Ground One, he says that "the State was unable to authenticate and establish a legitimate chain of custody" for his blood draw, and he blames his lawyer for not moving to suppress the "test results of a blood analysis which indicated the Petitioner had a high Blood Alcohol Level (BAL)." Petition at 5. In Ground Two, he alleges that his blood was drawn "without a warrant, consent, or any otherwise legal procedure" and insists (again) that his lawyer should have moved to suppress the results of his blood test. *Id.* at 8. In Ground Three, he castigates his trial counsel for not moving to "suppress Firefighter Francisco De Paz['s] statement concerning Petitioner's [post-accident] incriminating statement." *Id.* at 11.

The State concedes *both* that the Petition is timely, *see* Response at 23 ("The petition is timely."), *and* that Ramirez properly exhausted his claims in state court, *see id.* at 26 ("The Petitioner raised [these] claim[s] in his postconviction motion and on appeal. Thus, [the] claim[s] are exhausted."). So, we'll review all three grounds on their merits. But, because all three claims have already been adjudicated on their merits by a state court, *see Ramirez*, 356 So. 3d at 238; Order Denying Postconviction Motion [ECF No. 13-2] at 41–50, Ramirez can prevail only if the state court's ruling *either* "involved an unreasonable application of clearly established federal law" *or* "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). In assessing whether the state court's adjudication was "reasonable," we look to the "highest state court" that reached the merits of Ramirez's claims, *Newland v. Hall*, 527 F.3d 1162, 1199 (11th Cir. 2008)—which, in this case, was the Third DCA, *see Ramirez*, 356 So. 3d at 238. And, since the Third DCA merely affirmed the state postconviction court *without* a "decision on the merits in a reasoned opinion," we "look through" the unreasoned appellate decision to "the last related state-court decision that does provide a relevant rationale." *Wilson*, 138 S. Ct. at 1192. In our case, of course, that was the state postconviction court's Order Denying Postconviction Motion [ECF No. 13-2] at 41–50.

## I.      Assessing the Reasonableness of Counsel's Strategic Decisions

The state postconviction court denied all three of Ramirez's claims *both* because defense counsel had purposely declined to move to suppress any of this evidence as part of a reasonable trial strategy *and* because Ramirez knowingly and voluntarily agreed with this strategic decision. *See id.* at 49 ("Judge Ward specifically asked Defendant whether he agreed with his attorney's strategy to not file those motions. . . . The Defendant responded, 'Yes, I do.'"). Instead of moving to suppress this evidence, the state postconviction court explained, defense counsel relied on the eyewitness account of Fulgencio Alvarez, who testified "that [Ramirez] did not drink alcohol that evening." *Ibid.*; *see also*,

10

*e.g.*, Trial Tr. Vol. 5 [ECF No. 14-6] at 144 ("[Defense Counsel]: Did [Ramirez] smell like alcohol? [Alvarez]: Never. Q: Was [he] acting erratic in any way? A: At no time.").

A lawyer's intentional decision not to file a motion to suppress is a strategic decision that's "presumed [to be] reasonable" and which we will only overturn if the petitioner can establish "that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315; *see also Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("[T]he failure to file a suppression motion does not constitute *per se* ineffective assistance of counsel[.]"); *Zakrzewski v. McDonough*, 455 F.3d 1254, 1261 (11th Cir. 2006) (affirming the denial of an ineffective-assistance claim where the petitioner "failed to show that trial counsel's decision not to file a motion to suppress the evidence discovered during the warrantless search was a course no competent counsel would have taken under the circumstances"). And we're doubly deferential to the state postconviction court's denial of Ramirez's ineffective-assistance claims—which are premised on defense counsel's strategic decisions—because we must overlay "the deference due under § 2254" (which applies to the state court's findings) onto *Strickland*'s permissive "standard for judging the performance of counsel[.]" *Johnson v. Sec'y, DOC*, 643 F.3d 907, 910 (11th Cir. 2011); *accord Richter*, 562 U.S. at 105 ("Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so. . . . The [ultimate] question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." (cleaned up)).

In his papers, Ramirez attacks the reasonableness of his lawyer's decisions. Since the evidence wasn't suppressed, he says, the State easily proved the elements of the charged offenses and rendered Alvarez's testimony beside the point. *See* Reply at 5 ("The State would not have been able to prove an essential element without the introduction of the [Florida Department of Law Enforcement] reports establishing an above the legal limit BAL."). But we cannot blame a lawyer for failing "to raise a

11

nonmeritorious issue." *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001). The "trial lawyer," after all, "has to play the hand he's dealt in circumstances that are inevitably not ideal; money, time, and energy are finite, and sometimes the facts or law or both are stacked against him[.]" *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1299 (11th Cir. 2014); *see also id.* at 1300 ("The record in this case demonstrates that Bowers labored diligently to defend his client. He subjected the state's case to adversarial testing. And he lost in the face of overwhelming evidence that his client committed a terrible crime. That is bad news for Bates, but it is not a Sixth Amendment violation." (footnote omitted)). That's exactly what we have here. As we'll explain, none of the three motions to suppress Ramirez now says his lawyer should've filed would've been successful—and his lawyer cannot be blamed for having decided not to pursue a futile strategy. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

### II.     Ramirez's Grounds for Relief

#### A.  Ground One

Ramirez wouldn't have been able to suppress the results of his blood test merely because "the State was unable to locate the individual who drew the blood." Petition at 5. Under Florida law, "the state *is not required* to elicit testimony from every custodian in the chain. Relevant physical evidence is admissible unless there is *some indication of probable tampering* with the evidence." *Dodd v. State*, 537 So. 2d 626, 627 (Fla. 3d DCA 1988) (emphasis added); *see also Floyd v. State*, 850 So. 2d 383, 399 (Fla. 2002) ("A bare allegation by a defendant that a chain of custody has been broken is not sufficient to render relevant physical evidence inadmissible."). And Ramirez *doesn't even argue* that his blood test was tampered with. He only speculates that, without the person who drew his blood, "nobody could say that the blood in question was actually taken from the Petitioner and/or what steps where [sic] taken

to preserve the evidence." Petition at 5. As we've said, however, that's just insufficient to justify suppression under Florida law.

But, for three reasons, Ground One would fail *even if* Ramirez *had* suggested that the blood was tampered with. *One*, under Florida law, "[t]he mere fact that the State could not conclusively show the precise location of the items [at a specific] interval . . . does not by itself indicate a probability of tampering[.]" *Floyd*, 850 So. 2d at 399; *see also, e.g.*, *Jordan v. State*, 707 So. 2d 816, 818 (Fla. 5th DCA 1998) ("Jordan points out there was no evidence of the conditions under which the blood sample was stored while it was in the custody of the Florida Highway Patrol . . . en route to the Florida Department Law Enforcement for testing. . . . A mere possibility of tampering is insufficient [to make a chain-of-custody objection]."). Even if Ramirez had argued that his blood was tampered with, in other words, that argument (standing alone)—*i.e.*, without *some proof* of tampering—would have been insufficient to justify suppression under Florida law.

*Two*, at trial, the State adduced compelling evidence for its view that Ramirez's blood sample had *not* been tampered with. The lead detective on the case, Cesar Correa, explained that Ramirez was "issued an MR number" when he was admitted into the hospital, and (he added) the blood taken from Ramirez—the same blood that was then tested and introduced at trial—had been labeled with that *same* MR number. Trial Tr. Vol. 4 [ECF No. 14-5] at 33. The State also called *other* witnesses to testify that Ramirez's blood *hadn't* been tampered with. *See, e.g.*, Trial Tr. Vol. 5 [ECF No. 14-6] at 14 ("[Prosecutor]: And how did you verify that the packages of evidence, items, hadn't been tampered with? [Serologist Amanda Falcon]: I examined the outer packaging, and I [made] sure that all of the seals are still intact and that there's no holes within the plastic packaging."); *id.* at 70–71 ("[Prosecutor]: If there was any sort of contamination [of the blood sample], would those things be present: you said discoloration, personally [sic], maybe gas, whether the blood sample was clotted? [Head Toxicologist Dr. Lisa Reidy]: Correct. . . . Q: And in this case, after reviewing what was [sent] to you . . . was there

13

any indication of any of those items that would lead, potentially, or would mean that there's contamination in the sample? A: No, there wasn't. Q: And in your independent review, as well, did you see anything that would tip off that there's contamination in this case? A: Not from the images I reviewed, no.").

*Three*, the State—in addition to testing Ramirez's blood for its alcohol level—*also* conducted a DNA test to confirm that the blood sample, in fact, belonged to Ramirez. And the DNA analyst confirmed that the DNA obtained from the blood sample *matched* the DNA the police had gotten from Ramirez's oral standard. *See id.* at 33 ("So after concluding my interpretation of the evidence profile from the swabbing of the purple top tube, I was able to say . . . that [the] DNA profile matches that of Mr. Quintana Ramirez. The frequency of finding another random unrelated individual in the population at large is 1 in 40—excuse me, 48.26 octillion.").

For all these reasons, the state court would've denied any chain-of-custody-based motion to suppress the blood sample. Because Ramirez's lawyer thus cannot be blamed for not filing a futile motion, we **DENY** Ground One.

**B. Ground Two**

Ground Two fares no better. Here, remember, Ramirez says that his lawyer should have moved to suppress the results of the blood test because the police collected his blood without a warrant. *See* Petition at 8 ("Detective Correa obtained the blood draw without a warrant, consent, or any otherwise legal procedure."). But this argument is conclusively refuted by the record. Detective Correa, in fact, testified that he *did* get a warrant *before* he went to the hospital to get Ramirez's blood:

> [Prosecutor]: Now, does the hospital draw blood from patients from the direction of officers, or do they draw blood as a standard operating procedure for all patients?
>
> A: It's standard.
>
> Q: And did you obtain a warrant in this case to collect the blood?
>
> A: Yes, I did.

14

> Q: Does that mean a judge had to sign off on your collection of that blood?
>
> A: Yes.

Trial Tr. Vol. 4 [ECF No. 14-5] at 32; *see also id.* at 47 ("[Defense Counsel]: Is there a reason why you had to get a warrant? A: Yes. Q: Is the reason that Mr. Quintana Ramirez was not coherent to give consent for the draw? A: One of the reasons is that we can't forcibly take [blood] from persons who we suspect to be under the influence.").

Since Detective Correa *did* get a warrant before he collected the blood, Ramirez's claim is plainly meritless. *Cf. Schmerber v. California*, 384 U.S. 757, 770 (1966) ("Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned.").[3] But here's the thing: Detective Correa didn't even need a warrant to collect Ramirez's blood. The record is clear that Ramirez *couldn't* have consented to a blood draw because he was unconscious when he arrived at the hospital. *See* Trial Tr. Vol. 4 [ECF No. 14-5] at 48 ("[Detective Correa:] Detective Dominguez was not able to get that consent [from Ramirez] because of the defendant's incapacitation at the time."). The Supreme Court has explained that, when a police officer "has probable cause to arrest a motorist for drunk driving," but the "driver is unconscious and therefore cannot be given a breath test," the exigent-circumstances exception to the warrant requirement "almost always permits a blood test without a warrant." *Mitchell v. Wisconsin*,

---

[3] Although Ramirez concedes that Detective Correa applied for (and received) a search warrant, he now claims that the warrant was defective because it was obtained "[n]ine days after taking Petitioner's blood from the hospital[.]" Petition at 8; *see also* Reply at 9 (same). We aren't sure where Ramirez is getting these "nine days" from—and nothing in the record supports this allegation. In any event, we don't think it's plausible to believe that Detective Correa waited anywhere near that long because, if he had, there would have been no trace of the alcohol left in the blood sample. *See Missouri v. McNeely*, 569 U.S. 141, 169 (2013) (Roberts, C.J., concurring) ("Here, in fact, there is not simply a belief that any alcohol in the bloodstream will be destroyed; it is a biological certainty. Alcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour. Evidence is literally disappearing by the minute.").

15

139 S. Ct. 2525, 2531 (2019); *see also id.* at 2538 n.8 ("[S]ince unconscious suspects will often have their skin pierced and blood drawn for diagnostic purposes, allowing law enforcement to use blood taken from that initial piercing would not increase the bodily intrusion. In fact, dispensing with the warrant rule could *lessen* the intrusion."); *cf. McGraw v. State*, 289 So. 3d 836, 839 (Fla. 2019) (adopting the same rule for drunk and unconscious motorists that the U.S. Supreme Court announced in *Mitchell*).[4] This rule is rooted in the scientific reality that, as a DUI suspect's blood-alcohol level begins to dissipate, his "unconsciousness (or stupor) eliminates any reasonable opportunity for [a] breath test." *Mitchell*, 139 S. Ct. at 2534. Since Detective Correa got a warrant before collecting Ramirez's blood—and because he didn't need a warrant in any event—we **DENY** Ground Two.

C. **Ground Three**

In Ground Three, Ramirez says that his lawyer should have moved to suppress "Firefighter Francisco De Paz['s] statement concerning Petitioner's incriminating statement." Petition at 11. During his direct examination, Mr. de Paz testified that, while he was trying to stabilize Ramirez's neck with a cervical collar, the following exchange took place:

> As I was telling [Ramirez] what I was doing and putting the collar on, he kept saying that he was fine, that he was fine. And I told him, "Sir, there's been a severe accident. I need to put this on you," and he said "I don't need this. *I'm just drunk.*"

---

[4] In *Mitchell*, the Supreme Court recognized that, in "unusual case[s]," the exigent-circumstances exception might not apply—even if the suspected drunk driver is unconscious—such as where "a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." 139 S. Ct. at 2539; *but cf. id.* at 2540 (Thomas, J., concurring) ("As I have explained before, the imminent destruction of evidence is a risk in every drunk-driving arrest and thus implicates the exigent-circumstances doctrine." (cleaned up)). Of course, Detective Correa testified *both* that he would have requested a blood draw either way because "we already had a suspicion of the defendant being under the influence," Trial Tr. Vol. 4 [ECF No. 14-5] at 48, *and* (just as important) that the hospital had *already* "draw[n] blood as a standard operating procedure" when Ramirez was admitted, *id.* at 32. Since Ramirez's blood was being collected one way or the other, this limited carveout to the exigent-circumstances exception doesn't save him here.

16

Trial Tr. Vol. 3 [ECF No. 14-4] at 103–04 (emphasis added). Ramirez argues that de Paz shouldn't have been allowed to testify about this inculpatory statement because it "was involuntarily made" while Ramirez was "physically or mentally incapacitated." Petition at 11. Ramirez blames his lawyer for failing to "exclude the inadmissible statement," and he insists that "the outcome of the trial would have been different" if this motion to suppress had been filed. *Ibid.*

Again, however, this motion would have been futile. When a defendant makes an inculpatory statement *spontaneously*, courts treat that statement as voluntary and admissible so long as the statement wasn't made in response "to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Notably, "a defendant's mental condition, by itself and apart from its relation to official coercion," doesn't render a statement involuntary and doesn't require suppression. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). Indeed, the Florida Supreme Court has repeatedly held that a defendant's inculpatory statement isn't involuntary merely because he was intoxicated when the police questioned him. *See Thomas v. State*, 456 So. 2d 454, 458 (Fla. 1984) ("The mere fact that a suspect was under the influence of alcohol when questioned does not render his statements inadmissible as involuntary. 'The rule of law seems to be well settled that the drunken condition of an accused when making a confession, unless such drunkenness goes to the extent of mania, does not affect the admissibility in evidence of such confession, but may affect its weight and credibility with the jury.'" (quoting *Lindsey v. State*, 63 So. 832, 833 (Fla. 1913))). Instead, to render his statement to law enforcement involuntary, the defendant must show *either* that "his drunkenness rose to the extent of mania," *Kent v. Sec'y, Dep't of Corr.*, 2011 WL 6338842, at *7 (M.D. Fla. Dec. 19, 2011) (Covington, J.) (citing *Thomas*, 456 So. 2d at 458), *or* that law enforcement extracted an involuntary statement by deploying coercive techniques, *see Connelly*, 479 U.S. at 164–65 ("[P]olice learned during the interrogation that [the defendant] had a history of mental problems. The police exploited this weakness with coercive tactics[.]" (citing *Blackburn v. Alabama*, 361 U.S. 199, 207–08 (1960))).

As an initial matter, Ramirez made his statement to a firefighter—not a police officer—who was trying to save his life. Since Ramirez wasn't being questioned by law enforcement (or someone working with law enforcement) at the time of the inculpatory statement, his statement wasn't coerced and would *not* have been suppressed. *See Connelly*, 479 U.S. at 164 (noting that "a defendant's mental condition, by itself and apart from its relation to official coercion," doesn't render a statement involuntary and doesn't require suppression).

In any event, even if de Paz had been a police officer—and even if he had been questioning Ramirez when Ramirez made the inculpatory statement—the statement would *still* be voluntary. *First*, Mr. de Paz didn't exploit any coercive techniques to extract Ramirez's statement that he was "just drunk." On the contrary, the record is clear that Ramirez spontaneously and voluntarily made the statement in response to de Paz's *unrelated explanation* about why he was trying to stabilize Ramirez's neck with a cervical collar. *See* Trial Tr. Vol. 3 [ECF No. 14-4] at 103–04 ("As I was telling [Ramirez] what I was doing and putting the collar on, he kept saying that he was fine, that he was fine. . . . [A]nd he said 'I don't need this. I'm just drunk.'"); *see also Innis*, 446 U.S. at 301–02 ("But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."). *Second*, Ramirez wasn't "manic" when he spoke to de Paz.[5] Although Ramirez was obviously impaired, de Paz testified that Ramirez was still able to (1) "answer[ ] that his name was Quintana," (2) question de Paz about the need for the cervical collar, and (3) candidly assess his own condition as being "just drunk." Trial Tr. Vol. 3

---

[5] Florida courts have defined "mania" as a state of mind characterized by an inability "to comprehend in a general way what [one] is doing and to communicate with coherence and rationality." *Burns v. State*, 584 So. 2d 1073, 1075–76 (Fla. 4th DCA 1991).

[ECF No. 14-4] at 102–04; *cf. Burns*, 584 So. 2d at 1076 ("The quite specific factual findings pointedly include details that show more than the stupefied ramblings of one under the control of chemicals.").

Finally, even if a motion to suppress had been viable, the exclusion of de Paz's statement wouldn't have made any difference to the outcome of the trial. The jurors didn't need to hear de Paz tell them about Ramirez's confession because the State had already introduced overwhelming *objective* evidence of Ramirez's drunkenness. This included (as we've seen) the results of a blood draw, which showed that Ramirez had a "blood alcohol concentration [of] 0.123 grams per hundred [milliliters,]" which is *far above* Florida's legal limit of 0.08 grams/100 milliliters. Trial Tr. Vol. 5 [ECF No. 14-6] at 69. Since there isn't a "reasonable probability" that, even with the suppression of de Paz's statement, the outcome of the trial would've been different, Ramirez cannot show that he was prejudiced by counsel's unwillingness to file the motion to suppress. *See Strickland*, 466 U.S. at 694. Ground Three, in short, is **DENIED**.

\* \* \*

Ramirez's defense lawyer was faced with a Herculean task: to try to persuade twelve jurors—in the face of overwhelming physical evidence—that his client wasn't drunk when he caused a deadly car crash. To rebut the State's evidence, counsel called Ramirez's coworker (Alvarez) to testify that Ramirez hadn't been drinking that day. This strategy ultimately failed, but that doesn't mean counsel's strategy was *unreasonable*. In the end, counsel lost *not* because he failed to file a motion to suppress, but because he "face[d] [ ] overwhelming evidence that his client committed a terrible crime[.]" *Bates*, 768 F.3d at 1300. And, since the motion to suppress Ramirez now says his lawyer should've filed would have been meritless, we **DENY** Ramirez's Petition.

## EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary

19

hearing.'" *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). Based on what we've said—including and especially the presence of a robust trial and state-postconviction record—we don't think we'd benefit from any further factual development.

### CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)). Because jurists of reason wouldn't debate our assessment of Ramirez's constitutional claims, we'll **DENY** any request for a COA.

\* \* \*

Having carefully reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Petition [ECF No. 1] is **DENIED**, that a COA is **DENIED**, that any request for an evidentiary hearing is **DENIED**, that all deadlines are **TERMINATED**, and that any pending motions are **DENIED** as moot. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida on August 4, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: Yilian Quintana Ramirez, *pro se*
counsel of record